UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RxUSA WHOLESALE, INC.,

                              Plaintiff,          **MEMORANDUM AND ORDER**
                                                  06-CV-3447 (DRH)(AKT)


        v.


ALCON LABORATORIES, INC. et al.,


                              Defendants.
-------------------------------------------------------------X
**APPEARANCES:**

**For the Plaintiff:**
**The Law Firm of Michael Levine, P.C.**
15 Barclay Road
Scarsdale, New York 10583
By:  Michael L. Levine, Esq.

**For Defendants McKesson Corp., Brian Ferreira, and Peter J. Pasquale:**
**Latham & Watkins LLP**
885 Third Avenue
New York, NY 10022
By:  Terrence J. Connolly, Esq.
     Joseph M. Salama, Esq.

**Latham & Watkins LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
By:  Peter K. Huston, Esq.

**For Defendant H.D. Smith Wholesale Drug Company:**
**Schiff Hardin LLP**
623 Fifth Avenue
New York, NY 10022
By:  Carl W. Oberdier, Esq.

**For Defendant Bellco Drug Corp.:**
**Fulbright & Jaworski LLP**
666 Fifth Avenue
New York, NY 10103
By:  Mark A. Robertson, Esq.
Neil G. Sparber, Esq.

Nicholas I. Leitzes, Esq.

**For Defendant Cardinal Health, Inc.:**
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
By:  Tracy L. Cole, Esq.

**For Defendant AmerisouceBergen Corporation:**
**Klehr, Harrison, Harvey, Branzburg & Ellers LLP**
260 S. Broad Street
Philadelphia, PA 19102
By:  Paul G. Nofer, Esq.
     Lynn A. Collins, Esq.

**For Defendant Healthcare Distribution Management Association:**
**Olsson Frank Weeda Terman Bode Matz P.C.**
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
By:  Philip C. Olsson, Esq.
     Arthur Y. Tsien, Esq.

**Dewey Ballantine LLP**
1301 Avenue of the Americas
New York, NY 10019-6092
By:  Eamon O'Kelly, Esq.

**For the Defendant Pfizer Inc.:**[*]
**Gibson, Dunn & Crutcher LLP**
333 South Grand Avenue
Los Angeles, CA 90071-1512
By:  Daniel G. Swanson, Esq.

**Gibson, Dunn & Crutcher LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

---

[*]  While Gibson Dunn's Notice of Appearance was made solely for defendant Pfizer Inc., the firm has submitted its briefs on behalf of all of the manufacturing defendants, which are further defined herein.  Given that the list of counsel for the other manufacturing defendants is quite lengthy, the Court declines to list all of the names herein.  Instead, reference is made to docket no. 179, the Superseding Notice of the Manufacturers' Mot. to Dismiss, which sets forth counsel in their entirety.

By:  Daniel W. Nelson, Esq.
      Henry C. Whitaker, Esq.

**HURLEY, Senior District Judge:**

Plaintiff RxUSA Wholesale, Inc. ("Plaintiff"), a secondary wholesaler of

pharmaceutical products, brings this antitrust action alleging that defendants – pharmaceutical

manufacturers, authorized pharmaceutical wholesalers, and individuals in control of a

pharmaceutical enterprise (collectively, "Defendants") – have willfully acquired and sought to

maintain a monopoly and exclude competition by secondary wholesalers in the wholesale

pharmaceutical industry.  Defendants move to dismiss the Complaint for failure to state a claim,

pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  In the Complaint, Plaintiff seeks,

inter alia, an order enjoining and prohibiting Defendants from engaging in further allegedly

unlawful acts that violate the Sherman Act, 15 U.S.C. §§ 1-2; the Donnelly Act, N.Y. Gen. Bus.

Law §§ 340-347; the Sarbanes Oxley Act of 200 ("SOX"); and the Racketeer Influence and

Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Plaintiff also seeks damages

with regard to the alleged unlawful conduct.  For the reasons that follow, Defendants' motions

are granted and this case is dismissed.

## *BACKGROUND*

In crafting the following summary of facts, the Court accepts all of the factual

allegations in the Complaint as true.[1]

Plaintiff is a "secondary wholesaler" of pharmaceutical products that ships U.S.

FDA-approved pharmaceuticals to its customers.  A secondary wholesaler generally purchases

---

[1]  The Court notes that Plaintiff's Complaint is 163 pages and asserts 23 causes of action
against 25 defendants.

pharmaceuticals from "authorized wholesalers" -- wholesalers authorized to purchase directly from drug manufacturers -- and then resells them to its own customers, other non-authorized distributors and dispensing facilities.

Several states and the federal government have adopted pedigree rules to regulate the sale of prescription drugs to curtail the sale of counterfeit drugs in the United States. The federal pedigree rules require non-authorized pharmaceutical distributors to show pedigree information on all sales made, i.e., to document the chain of custody of pharmaceuticals from manufacturers to pharmacy or other dispenser, but exempt authorized pharmaceutical distributors from this requirement. Thus, in order to comply with the law, all unauthorized distributors must obtain appropriate pedigree information from the seller. The absence of such information renders illegal any sale of pharmaceutical products in the United States.[2]

## I.   *Plaintiff's Allegations Against the Authorized Wholesalers*

Plaintiff alleges that in the past, it purchased pharmaceuticals from the following five authorized wholesalers which in turn purchased directly from manufacturers: McKesson Corporation ("McKesson"), Cardinal Health Corporation ("Cardinal"), AmerisourceBergen Corp. ("AmerisourceBergen"), H.D. Smith, Inc. ("H.D. Smith"), and Bellco Drug Corp. ("Bellco"). These five companies are referred to in the Complaint, and will be hereinafter collectively referred to as, the Pharmaceutical Wholesaler Defendants or the "PWDs." Plaintiff

---

[2]  Plaintiff filed a separate lawsuit against the United States Department of Health and Human Services and the United States Food and Drug Administration, alleging, inter alia, that the federal pedigree rules are unconstitutional. *See RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.*, No. 2:06CV5086 (E.D.N.Y.). On January 7, 2009, this action was administratively closed without prejudice to reopen upon consent of all parties due to a Bill that was introduced in Congress that may moot the issues in this case.

4

alleges that the PWDs control more than 95% of the market for wholesale pharmaceutical products in the United States.

Plaintiff had a different relationship with each PWD, as set forth below.

**A.**    ***Plaintiff's Alleged Dealings With McKesson***

Plaintiff entered into a multi-year agreement with McKesson on October 1, 2003, under which McKesson agreed to supply pharmaceutical products to Plaintiff.  As a result of this agreement, McKesson became a primary supplier to Plaintiff.  From October 2003 through part of 2006, Plaintiff received approximately $529 million of goods from McKesson, an amount that was allegedly less than the full amount Plaintiff ordered.[3]  McKesson allegedly fraudulently reported to the manufacturers that Plaintiff was receiving 100% of the product it was ordering from McKesson.  In January 2006, McKesson advised Plaintiff that it would not provide Plaintiff with pedigree documentation necessary to permit lawful resale by Plaintiff of the pharmaceutical products purchased by Plaintiff from McKesson.  In February 2006, McKesson terminated its supply agreement with Plaintiff.

**B.**    ***Plaintiff's Alleged Dealings With Cardinal***

Plaintiff purchased pharmaceutical products from Cardinal beginning in November 2004 and then periodically thereafter through December 2005.  In January 2006, Cardinal notified Plaintiff that it would not supply to Plaintiff and others pedigree information necessary to permit lawful resale.  In July 2006, Cardinal notified Plaintiff that it would not supply Plaintiff with any more pharmaceutical products.

---

[3] Plaintiff filed a separate lawsuit against McKesson for damages allegedly stemming from McKesson's breach of its supply agreement.  *See RxUSA Wholesale, Inc. v. McKesson Corporation*, No. 06cv4343 (E.D.N.Y.).

C.      *Plaintiff's Alleged Dealings With AmerisourceBergen*

Plaintiff purchased pharmaceutical products from AmerisourceBergen from June 1999 through March 2000.  In January 2006, AmerisourceBergen announced that it would not supply to Plaintiff and others pedigree documentation necessary to permit lawful resale.  In July 2006, AmerisourceBergen notified Plaintiff that it would not supply any more pharmaceutical products to Plaintiff.

D.      *Plaintiff's Alleged Dealings With H.D. Smith*

Plaintiff purchased pharmaceutical products from H.D. Smith from September 2000 through November 2001.  On November 2001, H.D. Smith advised Plaintiff that it would not sell pharmaceutical products to any secondary wholesaler and has not sold any product to Plaintiff since that time.

E.      *Plaintiff's Alleged Dealings With Bellco*

Plaintiff intermittently purchased pharmaceutical products from Bellco from September 2000 through June 2006.  In January 2006, Bellco announced that it would not supply to Plaintiff and others pedigree information necessary to permit lawful resale.  In June 2006, Bellco notified Plaintiff that it would not supply Plaintiff with any pharmaceuticals.

F.      *PWDs' Alleged Intent*

Plaintiff alleges that in refusing to sell to Plaintiff, the PWDs' motivation was to consolidate "[each PWD's] monopoly and the monopoly power of the PWDs, prevent Plaintiff from growing its business to become an even larger competitor, eliminate Plaintiff as a competitor in the relevant market, and thereby keep wholesale prices for the products it offered to end users artificially high."  (Compl. ¶¶ 192, 203, 214, 227, 237.)

6

**F.     Plaintiff's Claims**

Plaintiff asserts the following causes of action against the PWDs:  (1) counts II-III and V-XII alleging that each PWD violated Section 2 of the Sherman Act by unilaterally refusing to sell to Plaintiff pharmaceutical products which Plaintiff labels as "essential facilities"; (2) counts XIII and XIV, alleging that each PWD violated Section 1 of the Sherman Act by allegedly conspiring with each other to refuse to deal with Plaintiff; and (3) count XX, alleging that such conduct also violated the Donnelly Act.  The Complaint also asserts two claims against McKesson only, count I for monopolization of the relevant geographic wholesale pharmaceutical product market in violation of Section 2 of the Sherman Act based on McKesson's termination of its supply agreement with Plaintiff, and count IV for attempted monopolization of the relevant geographic wholesale pharmaceutical product market in violation of Section 2 of the Sherman Act.

**II.     Plaintiff's Allegations Against Brian Ferreira and Peter J. Pasquale**

At all times relevant to the Complaint, Brian Ferreira ("Ferreira") was a Vice-President, and Peter J. Pasquale ("Pasquale") was a Senior Vice-President of McKesson.  As noted above, McKesson was Plaintiff's primary supplier of pharmaceuticals from October 2003 to February 2006 pursuant to a supply agreement between the parties.  Plaintiff alleges, inter alia, that Ferreira and Pasquale used the United States mails and wires to transmit fraudulent representations to various manufacturers intended to induce the manufacturers to believe that all of Plaintiff's pharmaceutical purchasing requirements were being met.

Plaintiff asserts the following causes of action against Ferreira and Pasquale: (1) count XXI, alleging that they violated SOX by issuing false reports, and (2) counts XXII and

XXIII, alleging that they violated the civil RICO statute via the transmission of these false reports.

**III.**     *Plaintiff's Allegations Against Healthcare Distribution Management Association*

Healthcare Distribution Management Association ("HDMA") is a voluntary association of wholesalers of pharmaceutical products which now excludes secondary wholesalers from its ranks. Each of the PWDs is a member of HDMA.

Plaintiff became a member of HDMA in or about 2005. On July 29, 2005, Plaintiff advised HDMA that it was having problems opening up accounts with most major pharmaceutical manufacturers and requested that HDMA look into this issue. In December 2005, Plaintiff was notified by HDMA that Plaintiff was no longer eligible for HDMA membership. Plaintiff alleges that the exclusion of Plaintiff from HDMA membership was "directed by, or acquiesced in by, the PWDs, whose intention was to exclude Plaintiff from participation in an essential industry organization and permit some of the Manufacturer Defendants to use the exclusion of Plaintiff from the HDMA as a purported 'basis' for refusal to deal with Plaintiff." (Compl. ¶ 251.) As a result, Plaintiff claims it is unable to compete with HDMA members in the wholesale pharmaceutical market.

Plaintiff asserts one cause of action against HDMA, count XIX, alleging that HDMA violated Section 2 of the Sherman Act by unilaterally refusing to provide Plaintiff with membership in HDMA, which membership Plaintiff alleges is an "essential facility."

**IV.**     *Plaintiff's Allegations Against the Manufacturers*

The pharmaceutical manufacturer defendants (collectively, the "Manufacturing

Defendants")[4] are the sole original source for certain branded and/or trademarked pharmaceutical products. Plaintiff alleges that the Manufacturing Defendants have wrongfully and illegally refused to deal with Plaintiff and other selected secondary wholesalers directly.

From the time it commenced operations through 2006, Plaintiff purchased large quantities of pharmaceuticals from one or more of the PWDs. Beginning in December 2003 and through March 2006, Plaintiff requested in writing that the Manufacturing Defendants sell pharmaceuticals directly to Plaintiff. According to the Complaint, all refused. Several of the Manufacturing Defendants advised Plaintiff that they would not sell products directly to Plaintiff because they were satisfied with their current distribution network. (*See, e.g.*, Compl. ¶¶ 54, 61, 75, 82, 97, 137, 156. 163, 170.) Others noted that they only sold to distributors who were members of HDMA (*see, e.g., id.* ¶ 82 ), or that they did not deal directly with secondary wholesalers. (*Id.* ¶ 121.) Still others did not respond to Plaintiff's request. (*See, e.g., id.* ¶¶ 68, 90, 104, 130.)

Plaintiff asserts the following causes of action against the Manufacturing Defendants: (1) counts XV and XVI, alleging that the Manufacturing Defendants violated Section 1 of the Sherman Act by allegedly conspiring with each other to refuse to deal with Plaintiff; (2) counts XVII-XVIII, alleging that each Manufacturing Defendant violated Section 2 of the Sherman Act, by unilaterally refusing to sell to Plaintiff pharmaceutical products which

---

[4] The Manufacturing Defendants are Alcon Laboratories, Inc., AstraZeneca Pharmaceuticals LP, Boehringer Ingelheim Corporation (USA), Boehringer Ingelheim Pharmaceuticals, Inc., Bristol-Myers Squibb Company, Eisai Inc., Forest Pharmaceuticals, Inc., GlaxoSmithKline, Inc., Kos Pharmaceuticals, Inc. Merck & Co., Inc., Novartis Pharmaceuticals Corporation, Organon International, Inc., Pfizer, Incorporated, Sanofi-Aventis Pharmaceuticals, Inc., Schering-Plough Corporation, Takeda Pharmaceutical Co., Ltd., and Wyeth.

are claimed to be "essential facilities"; and (3) count XX, alleging that such conduct also

violated the Donnelly Act.

## V.   *The Alleged Anti-Competitive Effects*

Plaintiff describes the alleged anti-competitive effects of the foregoing as follows:

[ ] Collectively, the Defendants have sought to prevent, and have succeeded in preventing, Plaintiff from acquiring widely-used pharmaceutical products on competitive terms for resale, failed to permit Plaintiff to acquire products in sufficient quantity, failed to provide pedigree information lawfully necessary for Plaintiff to resell pharmaceutical goods, and ultimately refused to provide any product to Plaintiff at all, all of which made it impossible for Plaintiff to adequately compete or exist in the relevant market.

[ ] The Defendants' unlawful acts have been directed primarily at Plaintiff and selected other "secondary wholesalers," which represent a significant competitive source of supply for pharmaceutical products on a nationwide basis.  Having obtained their monopoly position, the Defendants have aggressively misused their monopoly power to gain further competitive advantages and totally suppress competition in the relevant market by, among other things, such means as refusing to deal, entering into exclusive contracts, exercising preferential and restrictive arrangements among themselves, filing false statements with Manufacturers, failing to make full and complete disclosures to the SEC and their public shareholders in compliance with section 10(B)(5) of the federal securities laws, and refusing to provide necessary pedigree information so as to render goods lawfully resalable in all States of the United States.

(Compl. ¶¶ 13-14.)

## VI.   *The Motions Before the Court*

Presently before the Court are four separate motions to dismiss pursuant to Rule

12(b)(6) made by the following defendants: (1) the Manufacturing Defendants; (2) the PWDs;

(3) McKesson, Pasquale, and Ferreira (the "McKesson Defendants"); and (4) HDMA.  For the

reasons explained below, all four motions are granted in their entirety and the Complaint is

dismissed.

## DISCUSSION

## I.   *Motion to Dismiss: Legal Standards*

Rule 8(a) provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has recently clarified the pleading standard applicable in evaluating a motion to dismiss under Rule 12(b)(6).

First, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court disavowed the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly*, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 555 (citations and internal quotation marks omitted).

More recently, in *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937 (2009), the Supreme Court provided further guidance, setting forth a two-pronged approach for courts deciding a motion to dismiss. First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at

11

1950.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual assumptions."  *Id.*  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555)).

Second, "[w]hen there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 1950.  The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must look to the allegations on the face of the complaint, but may also consider "[d]ocuments that are attached to the complaint or incorporated in it by reference."  *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007).  *See also Gillingham v. GEICO Direct*, 2008 WL 189671, at *2 (E.D.N.Y. Jan. 18, 2008) (noting that a court considering a motion to dismiss "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint") (citation and internal quotation marks omitted).

## II.    *Plaintiff's Claims Against the Manufacturing Defendants are Dismissed*

### A.    *Plaintiff's Claims Under Section 2 of the Sherman Act are Dismissed*

Counts XVII and XVIII assert violations of Section 2 of the Sherman Act against

12

the Manufacturing Defendants.  Count XVII is entitled "Monopolization of the Relevant

Geographic Wholesale Pharmaceutical Product Market (Refusal to Deal)" and alleges that the

Manufacturing Defendants refused to supply product to Plaintiff in an effort to eliminate

competition from Plaintiff and other wholesalers in violation of Section 2.  (Compl. at 119.)

Count XVIII is entitled "Monopolization of the Relevant Geographic Wholesale Pharmaceutical

Product Market (Denial of an Essential Facility to Compete)" and alleges that the pharmaceutical

products sold by the Manufacturing Defendants are "essential facilities" that Plaintiff cannot

obtain through any other source and that the Manufacturing Defendants' refusal to provide

Plaintiff with these essential facilities violates Section 2.  (*Id.* at 121.)

       There are two elements to a Section 2 claim for monopolization:  (1) "the

possession of monopoly power in the relevant market" and (2) "'the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident.'"  *Verizon Commc'ns Inc. v. Law Offices

of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384

U.S. 563, 570-71 (1966)).  Here, the Complaint founders on both elements.

      1.     ***The Complaint Fails to Allege that the Manufacturing
Defendants Possess Monopoly Power in the Relevant Markets***

       "[I]t is axiomatic that a firm cannot monopolize a market in which it does not

compete."  *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other

grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).  The Complaint identifies four

markets, viz. (1) the wholesale market (all entities that purchase pharmaceutical products for

resale); (2) the group purchasing market (all entities that purchase pharmaceutical products on

behalf of a group of resellers or dispensing facilities); (3) the dispensing facility market (all

persons and entities that dispense pharmaceutical products to consumers); and (4) governmental agencies and related facilities that dispense pharmaceutical products to consumers.  (Compl. ¶ 273.)  There is no allegation that the Manufacturing Defendants have any presence whatsoever in any of the alleged markets, much less any allegation that they possess monopoly power in those markets.  Accordingly, Plaintiff's Section 2 monopolization claims fail to state a claim against the Manufacturing Defendants.  *See, e.g.*, *Discon*, 93 F.3d at 1062 (defendant may be held liable for monopolization under Section 2 only if the *defendant itself* competed directly in that market).

Citing no authority, Plaintiff attempts to avoid this conclusion by asserting that because the Manufacturing Defendants supply the wholesalers with pharmaceuticals, they sell all of their product "directly in" the wholesale market and consequently "compete" therein.  (Pl.'s Mem. of Law in Opp'n to Manufacturer Defs.' Rule 12(b) Mot. to Dismiss at 8.)  Plaintiff's attempt to transform the Manufacturing Defendants into wholesalers is wholly without merit. *See, e.g.*, *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 911 (S.D.N.Y. 1985) (" [A] distributor is not a competitor of the manufacturer and not his rival.").

### 2.    *The Complaint Fails to Allege Anticompetitive Conduct*

Even assuming arguendo the existence of monopoly power, the Complaint fails to allege that the Manufacturing Defendants engaged in anticompetitive conduct and thus fails to allege a Section 2 claim for this independent reason.

#### a.    *Plaintiff's Refusal to Deal Claims*

The Supreme Court has made clear that a refusal to deal with other firms does not typically violate Section 2.  *See Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109, 1118 (2009) ("As a general rule, businesses are free to choose the parties with whom they

14

will deal, as well as the prices, terms, and conditions of that dealing."); *Trinko*, 540 U.S. at 408

("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader

or manufacturer engaged in an entirely private business, freely to exercise his own independent

discretion as to parties with whom he will deal.'") (quoting *United States v. Colgate & Co.*, 250

U.S. 300, 307 (1919)).  "Observing that it has been 'very cautious' in creating exceptions to the

right to refuse to deal, the *Trinko* Court noted a sole exception, set forth in the earlier case of

*Aspen Skiing*,[5] which *Trinko* described as situated 'at or near the outer boundary of § 2

liability.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (quoting *Trinko*, 540

U.S. at 409)).

"That exception applies when a monopolist seeks to terminate a prior (voluntary) course of

dealing with a competitor."  *Id.*  The *Trinko* Court explained the rationale behind this exception:

"The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing

suggested a willingness to forsake short-term profits to achieve an anticompetitive end."  *Trinko*,

540 U.S. at 409 (emphasis in original).

   Here, Plaintiff has conceded that the Manufacturing Defendants and Plaintiff are

not in competition.  (*See* Pl.'s Mem. in Opp'n to Manufacturer Defs.' Rule 12(b) Motion to

Dismiss at 10.)  As in *Trinko* then, Plaintiff's claim is simply "not a recognized antitrust claim

under th[e Supreme] Court's existing refusal-to-deal precedents."  *Trinko*, 540 U.S. at 410; *see

id.* at 408 ("Under certain circumstances, a refusal to cooperate with *rivals* can constitute

anticompetitive conduct and violate § 2.") (emphasis added).

   Moreover, even assuming Plaintiff was in direct competition with the

---

   [5]  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

Manufacturing Defendants, the *Aspen Skiing* exception would still not apply as the Manufacturing Defendants never voluntarily did business with Plaintiff. *See Trinko*, 540 U.S. at 409 ("The refusal to deal alleged in the present case does not fit within the limited exception recognized in *Aspen Skiing*. The complaint does not allege that [defendant] voluntarily engaged in a course of dealing with its rivals.").

In sum, because Plaintiff is not a competitor of the Manufacturing Defendants and never conducted business with them, the Manufacturing Defendants did not have a duty to deal with Plaintiff in these circumstances. Accordingly, Plaintiff's claims under Section 2 for a refusal to deal are dismissed.

### b. *Plaintiff's Essential Facilities Claims*

Plaintiff alleges that the Manufacturing Defendants control pharmaceuticals that are essential for Plaintiff to compete in each of the relevant markets. The elements of an essential facility claim under Section 2 are "'(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.'" *Twin Labs, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir. 1990) (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983)). "The policy behind prohibiting denial of an essential facility to a competitor, at least in part, is to prevent a monopolist in a given market . . . from using its power to inhibit competition in another market . . . ." *Id.* at 568. A "defendant must be a competitor of the entity to which it denies reasonable access to the essential facility for there to be a violation of section 2 of the Sherman Act." *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atl. Corp.*, 305 F.3d 89, 108 n.12 (2d Cir. 2002), *rev'd*

*on other grounds*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

407 (2004);[6] *see also Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,

485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007) ("[T]he essential facility doctrine is intended to

prevent a *competitor* from obtaining an unfair advantage in a market by denying to its actual or

potential *competitors* access to a facility essential for use of that market.") (emphasis in original).

Because the Manufacturing Defendants do not compete with Plaintiff, Plaintiff's alternative

theory of monopolization based on the essential facilities doctrine fails as a matter of law.

Accordingly, Plaintiff's Section 2 claims against the Manufacturing Defendants are dismissed.

**B.**     ***Plaintiff's Claims Under Section 1 of the Sherman Act are Dismissed***

Counts XV and XVI assert violations of Section 1 of the Sherman Act against the

Manufacturing Defendants.  Count XV is entitled "Monopolization of the Relevant Geographic

Wholesale [Pharmaceutical Product Market] Concerted Refusal to Deal – Per Se Violation" and

alleges that in an effort to control the price of their products, the Manufacturing Defendants

conspired not to provide pharmaceutical products to Plaintiff or any wholesaler other than the

PWDs and in doing so, committed a per se violation of Section 1.  (Compl. at 116.)  Count XVI

is entitled "Monopolization of the Relevant Geographic Wholesale [Pharmaceutical Product

Market] Concerted Refusal to Deal – Rule of Reason Violation" and alleges that if the

Manufacturing Defendants' concerted refusal to deal with any wholesalers other that the PWDs

is not per se unlawful, it is unlawful under the rule of reason.  (*Id.* at 117.)

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the

---

[6]  In reversing the Circuit Court on other grounds, the Supreme Court in *Trinko* noted that
it had never recognized the essential facilities doctrine and that it "f[ou]nd no need either to
recognize it or to repudiate it here."  540 U.S. at 411.

17

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations."  15 U.S.C. § 1.  Thus, to state a Section 1 claim, a plaintiff must

establish: "[1] a combination or some form of concerted action between at least two legally

distinct economic entities that [2] constituted an unreasonable restraint of trade either per se or

under the rule of reason."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002)

(citations and internal quotation marks omitted).  For the reasons that follow, the Court finds that

Plaintiff's Section 1 claims fail because the Complaint does not allege facts which plausibly

suggest an agreement.[7]

### 1.    *The Complaint Fails to Allege the Existence of an Actionable Conspiracy by the Manufacturing Defendants*

In *Twombly*, the Supreme Court was faced with the "question of what a plaintiff

must plead in order to state a claim under § 1 of the Sherman Act."  550 U.S. at 554-55.  The

Court answered this question thusly:

> [W]e hold that stating . . . a [§ 1] claim requires a complaint with
> enough factual matter (taken as true) to suggest that an agreement
> was made.  Asking for plausible grounds to infer an agreement
> does not impose a probability requirement at the pleading stage; it
> simply calls for enough fact to raise a reasonable expectation that
> discovery will reveal evidence of illegal agreement. . . . In
> identifying facts that are suggestive enough to render a § 1
> conspiracy plausible, we have the benefit of the prior rulings and
> considered views of leading commentators, already quoted, that
> lawful parallel conduct fails to bespeak unlawful agreement.  It
> makes sense to say, therefore, that an allegation of parallel conduct
> and a bare assertion of conspiracy will not suffice.  Without more,
> parallel conduct does not suggest conspiracy, and a conclusory
> allegation of agreement at some unidentified point does not supply

---

[7]  Because the Court finds that Plaintiff fails to allege the first element of a Section 1 claim, the Court need not, and does not, address the second element, viz. whether Plaintiff has alleged an unreasonable restraint of trade.

> facts adequate to show illegality.  Hence, when allegations of
> parallel conduct are set out in order to make a § 1 claim, they must
> be placed in a context that raises a suggestion of a preceding
> agreement, not merely parallel conduct that could just as well be
> independent action.
>
> . . . .  An allegation of parallel conduct is thus much like a naked
> assertion of conspiracy in a § 1 complaint: it gets the complaint
> close to stating a claim, but without some further factual
> enhancement it stops short of the line between possibility and
> plausibility of entitle[ment] to relief.

*Id.* at 556-57 (citation and internal quotation marks omitted).[8]

Plaintiff argues that a plausible inference of conspiracy can be drawn from three sources in the Complaint: (1) allegations of agreements made at some unidentified time and place; (2) allegations of parallel conduct; and (3) allegations suggesting anticompetitive motive. For the reasons that follow, the Court finds that these allegations are insufficient to establish a plausible inference of conspiracy.

### a.    *Conclusory Allegations of Agreement*

In support of its claim that the Manufacturing Defendants entered into an agreement, Plaintiff cites to, and the Court's review of the pleading reveals, only a single paragraph of the Complaint:

> Each of the Manufacturers has agreed with each other not
> to provide pharmaceutical products to Plaintiff or any wholesaler
> other than the PWDs (and a small group of other insignificant
> authorized distributors who are "grandfathered" in).  The intent
> and effect of these actions is that Plaintiff, and all wholesalers
> other than the PWDs, be eliminated as legitimate competitors to
> the PWDs such that the Manufacturers can maintain distribution of

---

[8]  In its opposition papers, Plaintiff relies heavily on the Second Circuit's decision in *Twombly v. Bell Atl. Corp.*, 425 F.3d 99 (2d Cir. 2006), which has since been reversed by the Supreme Court.

> their product through a small group of purchasers and, thereby,
> control the price of their products.

(Compl. ¶ 437.)  The Complaint contains no allegations as to when the alleged conspiracy began, where it occurred, or what statements the Manufacturing Defendants made to one another. Instead, it simply states the naked conclusion that the Manufacturing Defendants have "agreed with each other" not to deal with Plaintiff.  Under *Twombly*, as well as controlling Second Circuit precedent, such conclusory allegations are insufficient to state a claim.  *See Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality [under Section 1]."); *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (finding that general allegations of conspiracy "without any specification of any particular activities by any particular defendant" is insufficient to allege a Section 1 claim).

### b.    *Parallel Conduct*

Plaintiff argues that certain parallel conduct evinces a conspiracy, "consisting of an almost identical false, written response to [Plaintiff] when it attempted to purchase goods [from the Manufacturing Defendants]."  Plaintiff continues that "the Manufacturers would either simply refuse to respond to the request, or provide a form letter stating that no goods would be sold directly to [Plaintiff] because the manufacturer had 'adequate distribution' of its products in [Plaintiff's] geographic area."  (Pl.'s Mem. of Law in Opp'n to Manufacturer Defs.' Rule 12(b) Mot. to Dismiss at 16.)  This argument fails.

First, Plaintiff's characterization of the Manufacturing Defendants' conduct as parallel is questionable.  The Complaint alleges that some of the Manufacturing Defendants failed to respond to Plaintiff's solicitations while others responded via letter.  With regard to the latter category, the Complaint alleges that several of the Manufacturing Defendants responded to

Plaintiff in different ways.  For example, the Complaint alleges that Eisai advised Plaintiff that it only sold to wholesalers who were members of HDMA and that it had established an adequate distribution of its products through its existing network of authorized distributors.  (Compl. ¶ 82.)  Merck advised Plaintiff that it was not currently eligible for a direct account with Merck as it did not have enough direct purchasing relationships with other manufacturers and it did not perform enough services for its customers.  (*Id.* ¶ 111.)  Sanofi-Aventis is alleged to have agreed to deal with Plaintiff but only if Plaintiff would disclose the identity of each of its customers. (*Id.* ¶¶ 146-48.)

Even assuming arguendo that the Manufacturing Defendants' responses could be considered parallel, *Twombly* makes clear that allegations of parallel conduct alone are insufficient to infer conspiracy.  In that regard, the conduct claimed to be conspiratorial is nothing more than the continuation of preexisting distribution patterns.  Plaintiff *never* had a direct purchasing relationship with any of the Manufacturing Defendants.  The claim that Plaintiff solicited each of the Manufacturing Defendants asking to become its authorized distributor and was either met with a written refusal or no response at all cannot, without more, give rise to an inference of conspiracy.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 51 (finding that plaintiff's allegations of parallel conduct did "not constitute 'plausible grounds to infer an agreement' because, while that conduct is 'consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'") (quoting *Twombly*, 550 U.S. at 554). Because Plaintiff's allegations are not "placed in a context that raises a suggestion of a preceding agreement, [but] merely [suggests] parallel conduct that could just as well be independent

action," *Twombly*, 550 U.S. at 557, Plaintiff's allegations of parallel conduct fail to allege a conspiracy claim under Section 1.

### c. *Anticompetitive Motive*

Finally, Plaintiff argues that the Manufacturing Defendants' motive to conspire, which is allegedly apparent from the Complaint, is sufficient to support its conspiracy claim. Plaintiff submits that "[t]he Complaint makes clear that the Manufacturers' motive was to eliminate secondary wholesaler competition from the market and, thereby, keep prices artificially high." (Pl.'s Mem. of Law in Opp'n to Manufacturer Defs.' Rule 12(b) Mot. to Dismiss at 15 (citing paragraph 4 of Compl.).) In other words, "[b]y keeping the amount of distributors low, the end user has a limited source from which it can buy product and the distributors can, therefore, keep prices high." (*Id.* at 16. n.14.)

This contention is at odds with antitrust law in this Circuit which recognizes that each manufacturer has an incentive to maintain as much wholesale competition as possible so long is it is consistent with the efficient distribution of its products. As explained by the Second Circuit:

> The power to restrict output to maximize profit is complete in the manufacturing monopoly, and there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product. On the contrary, a firm with a monopoly at the retail distribution level will further reduce output to maximize its profits, thereby reducing the sales and profit of the monopoly manufacturer. Like any seller of a product, a monopolist would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits in the way of, for example, product promotion or distribution.

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006); *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995) (noting that "sole incentive" of a

22

manufacturer with a monopoly over the product it distributes "is to select the cheapest method of

distribution").  Because there is nothing suspect about a manufacturer's decision to decline to

expand an existing distribution network, especially one already comprised of five "major"

wholesalers and other "small authorized wholesalers" that have nationwide reach, (Compl. ¶¶ 5,

463), the Court finds that the Complaint fails to allege facts suggesting anticompetitive motive.

*Cf. E&L Consulting*, 472 F.3d at 30.

In sum, the Court finds that Plaintiff has failed to allege plausible grounds to infer

an agreement between the Manufacturing Defendants.  Accordingly, Plaintiff's Section 1 claims

against the Manufacturing Defendants are dismissed.

### 2. *Plaintiff's New Conspiracy Theory; The Manufacturing Defendants Acted in Concert with the PWDs to Violate Section 1*

In a last ditch effort to avoid dismissal of its Section 1 claims against the

Manufacturing Defendants, Plaintiff argues that:  "Alleged in the Complaint is a wide

combination consisting of both manufacturers and distributors, collectively forcing a competing

market segment out of business."  (Pl.'s Mem. of Law in Opp'n to Manufacturer Defs.' Rule

12(b) Mot. to Dismiss at 19.)  Contrary to Plaintiff's assertion, this conspiracy theory between

the Manufacturers and the PWDs is not alleged in the Complaint.

"It is long-standing precedent in this circuit that parties cannot amend their

pleadings through issues raised solely in their briefs."  *Fadem v. Ford Motor Co.*, 352 F. Supp.

2d 501, 516 (S.D.N.Y. 2005).  Even if the Court were to consider these new allegations, they fail

to demonstrate a viable conspiracy claim.

These allegations are nothing more than legal conclusions of agreement and

conspiracy.  Such allegations do not state facts sufficient to "nudge[ plaintiff's] claims across the

line from conceivable to plausible," *Twombly*, 127 S. Ct. at 1974, as required by the Supreme

Court.  In fact, far from being plausible, this unpleaded theory of an industry-wide conspiracy

against Plaintiff is inconsistent with the allegations in the Complaint which allege that the PWDs

sold pharmaceuticals to Plaintiff from 1999 to 2006.  Thus, under Plaintiff's new theory, we are

to believe that the PWDs were conspiring with the Manufacturing Defendants to drive Plaintiff

out of the industry at the very same time the PWDs were supplying Plaintiff with product.

Which is to say, not only does Plaintiff's new theory fail to allege parallel conduct between the

PWDs (who were supplying Plaintiff) and the Manufacturing Defendants (who never sold to

Plaintiff), it is wholly implausible.  That deficiency, together with the fact that there are no

allegations as to when this alleged scheme formed or what the alleged conspirators specifically

agreed to do, compels the conclusion that Plaintiff's new conspiracy theory cannot withstand

dismissal under Rule 12(b)(6).

Finally, to the extent Plaintiff attempts to assert this unpleaded theory of

conspiracy between the Manufacturing Defendants and the PWDs under Section 2, such a claim

would fail for the same reasons set forth immediately above with regard to the unpleaded Section

1 conspiracy claim.[9]  Although *Twombly* involved a conspiracy claim under Section 1, the

Second Circuit has held that the pleading standards enunciated in that case apply with equal

force to a Section 2 claim.  *See Elevator Antitrust Litig.*, 502 F.3d at 50.

**C.**     ***Plaintiff's Claims Under the Donnelly Act are Dismissed***

The Donnelly Act declares illegal every contract, agreement, arrangement or

---

[9]  In addition to prohibiting monopolization, Section 2 of the Sherman Act also prohibits combinations or conspiracies to monopolize**.**  *See* 15 U.S.C. § 2.

combination whereby a monopoly is established or maintained, or whereby competition or the free exercise of any activity in the conduct of any business, trade or commerce is restrained. N.Y. General Business Law § 340(1).  The Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act.  *See State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 462-63 (1976); *see also Great Atl. & Pac. Tea Co., Inc. v. Town of East Hampton*, 997 F. Supp. 340 (E.D.N.Y. 1998) (finding Donnelly Act is modeled after the Sherman Act and is generally interpreted in accordance with federal precedent).  As a result, the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."  *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994) (citations and internal quotation marks omitted); *see also Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 244 n.8 (S.D.N.Y. 2003), *aff'd*, 80 Fed. Appx. 722 (2d Cir. 2003).  Because Plaintiff's federal antitrust claims have been dismissed, Plaintiff's claims under the Donnelly Act are dismissed as well.  *See Empire Volkswagon, Inc. v. World-Wide Volkswagon Corp.*, 814 F.2d 90, 98 (2d Cir. 1987) (dismissal of Sherman Act claim required dismissal of Donnelly Act claim).

**III.**    *Plaintiff's Claims Against the PWDs are Dismissed*

**A.**    *Plaintiff's Claims Under Section 2 of the Sherman Act are Dismissed*

Counts I[10] through III and V through XII assert violations of Section 2 against the

---

[10]  Count I asserts a Section 2 "monopoly leveraging" claim against McKesson.  In its opposition papers, Plaintiff states that this reference to monopoly leveraging was incorrect and that Count I "was intended to (and does) assert a Section 2 refusal to deal claim against McKesson as a result of its anti-competitive termination of a Supply Agreement between McKesson and [Plaintiff] (as distinguished from Count 2, which asserts a refusal to deal claim

PWDs alleging that each PWD monopolized the relevant wholesale pharmaceutical product market based upon their "Refusal to Deal" with Plaintiff and "Denial of [an] Essential Facility To Compete." (Compl. at ii-iii.) As noted above, there are two elements to a Section 2 claim for monopolization: (1) "the possession of monopoly power in the relevant market" and (2) "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Trinko,* 540 U.S. at 407 (quoting *Grinnell Corp.*, 384 U.S. at 570-71). For the reasons set forth below, the Court finds that the Complaint fails to allege the first element, possession of monopoly power, and therefore Plaintiff's Section 2 claims against the PWDs must be dismissed.[11]

> ### 1. *The Complaint Fails to Allege that the PWDs Possess Monopoly Power in the Relevant Markets*

As noted above, in order to state a valid claim for monopolization under Section 2, a plaintiff must allege as a threshold requirement that the defendant enjoys monopoly power in the relevant market. Here, Plaintiff does not quantify the individual share of the U.S. market that each PWD controls. Instead, the Complaint aggregates the market shares of all the PWDs. In this regard, the Complaint alleges that the PWDs together "control[] more than 95% of the market for wholesale pharmaceutical products in the United States." (Compl. ¶¶ 180, 197, 208, 219, 231.) For the reasons explained below, this failure to allege the individual market share of each PWD is fatal to Plaintiff's Section 2 claims.

Section 2 prohibits monopolization, attempted monopolization, and combinations

---

against Defendant McKesson independent of the termination of the Supply Agreement)." (Pl.'s Mem. of Law in Opp'n to Wholesaler Defs.' Rule 12(b) Motion to Dismiss at 17.)

[11] The Court need not, and does not, address the second element of a Section 2 claim.

or conspiracies to monopolize. *See* 15 U.S.C. § 2. Here, the Complaint asserts claims under Section 2 against the PWDs for monopolization. "Traditionally, the offense of monopolization occurs where one firm possesses monopoly power." *Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp. 2d 729, 737 (E.D.N.Y. 1999). "Some commentators, however, have posited that Section 2 may be invoked against shared monopolies in which 'no single firm possesses sufficient power to be considered a "monopolist" but nevertheless a relatively few firms achieve monopoly-like' results." *Id.* (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 810 (1996)). "Professors Areeda and Hovenkamp admit, however, that 'courts and the Federal Trade Commission have universally rejected claims that Section 2 condemns "shared" monopoly.'" *Id.* (quoting P. Areeda & H. Hovenkamp, *Antitrust Law*, at ¶ 810g).

The Second Circuit has specifically rejected monopolization claims under Section 2 based on a shared monopoly theory of liability. *See H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (stating that "the district court correctly concluded that the market shares of [defendants] could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section 2, 15 U.S.C. § 2"); *see also Flash Elecs., Inc. v. Univ. Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 397 (E.D.N.Y. 2004). Plaintiff acknowledges as much in its memorandum of law. (Pl.'s Mem. of Law in Opp'n to Wholesaler Defs.' Rule 12(b) Motion to Dismiss at 9 n.6 ("[I]t is true that market shares may not, in this circuit, be aggregated to *de facto* establish monopolization . . . .").) Accordingly, Plaintiff's Section 2 monopolization claims against the PWDs are dismissed.

Recognizing the deficiency of its Section 2 unilateral monopolization claims against the PWDs, Plaintiff now contends that the PWDs have collectively monopolized the

pharmaceutical wholesale market and are therefore liable under Section 2 for conspiring to monopolize.  Plaintiff contends that even if a shared monopoly cannot form the basis of monopolization claims under § 2, "the Second Circuit has not yet squarely addressed the question of whether a 'shared monopoly' theory of liability is itself viable in the context of a combination by competitors to exclude competition,"(*id.*), or in other words, a Section 2 conspiracy to monopolize.  The problem with this argument is threefold.

First, and as discussed *supra*, parties may not amend their pleadings through issues raised solely in their briefs.[12]  *Fadem*, 352 F. Supp. 2d at 516.

Next, even if the Court were to consider these new allegations, given that "districts courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act," *Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612, 2004 WL 2071689, at *1 n.1 (S.D.N.Y. Sept. 16, 2004) (collecting cases), the Court harbors grave doubt whether such a claim is even viable.  *See Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 391-92 (D. Md. 1990) ("An examination of the history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete domination of a market by a single economic entity."); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 741-42 (E.D.N.Y. 1987) ("The notion that two *competitors* could conspire to monopolize is, seemingly, antithetical."), *aff'd*, 879 F.2d 1018 (2d

---

[12]  The Section 2 claims are entitled "Monopolization of the Relevant Geographic Pharmaceutical Product Market" and make no reference to a conspiracy to monopolize.  (*See, e.g.*, Compl. at 81, 83.)

Cir. 1989).[13]

Third, even if a shared monopoly theory of liability was viable in the context of a claim of conspiracy to monopolize, Plaintiff's claim would still fail because, as explained *infra* at pages – (Court's discussion of Plaintiff's Section 1 conspiracy claims against the PWDs), the Complaint does not contain sufficient facts to plausibly suggest the existence of a conspiracy between the PWDs.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 50 (*Twombly 's* pleading requirements apply equally to Section 1 and Section 2 conspiracies).

In sum, Plaintiff's Section 2 monopolization claims against the PWDs fail to state a claim because Plaintiff has failed to allege that any PWD possesses monopoly power in the relevant market.  To the extent Plaintiff has claims for conspiracy to monopolize, these claims fail as well as no conspiracy is pled.  Accordingly, Counts II through III and V through XII alleging claims under Section 2 against the PWDs are dismissed.

**B.** ***Plaintiff's Claims Under Section 1 of the Sherman Act are Dismissed***

**1.** ***The Complaint***

Counts XIII and XIV assert violations of Section 1 of the Sherman Act against the PWDs.  Count XIII asserts that the PWDs are horizontal competitors of the Plaintiff and that

---

[13]  In support of its shared monopoly theory, Plaintiff relies on the Supreme Court's decision in *Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946), where the Court affirmed the conviction of three major tobacco companies for a Section 2 conspiracy.  The Court limited its review to the narrow question of whether the exclusion of competitors is a necessary element of monopolization under Section 2.  *Id.* at 784.  Although the Court did not directly address the feasibility of the shared monopoly theory, it arguably implicitly recognized such theory by affirming the convictions.  Thus, the *Am. Tobacco* case "has given some courts pause about categorically rejecting the shared monopoly theory in the context of a conspiracy to monopolize claim."  *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007).  Nonetheless, Plaintiff has pointed to no case where such a theory was in fact upheld.

they committed a per se violation of Section 1 by engaging in a "Concerted Refusal to Deal"

with Plaintiff.  Count XIII alleges as follows:

> 425.  Each of the PWDs has agreed with each other not to provide
> to Plaintiff or to any other "secondary wholesaler" pharmaceutical
> products or pedigree documentation or electronic information to
> make such products resalable.  The intent and effect of these
> actions is that Plaintiff, and all other secondary wholesalers, be
> eliminated as legitimate competitors to the PWDs and be forced
> out of business.
>
> 426.  The PWDs' actions constitute a concerted refusal to deal
> (also known as a "group boycott'), which is unlawful per se under
> Section 1 of the Sherman Act (15 USC § 1).
>
> 427.  The PWDs' actions have harmed Plaintiff and other
> secondary wholesalers as well as consumers who would have
> benefitted from increased competition for pharmaceutical products.
>
> 428.  As a direct and proximate result of the PWDs' improper
> group boycott, Plaintiff has been injured in its business and
> property in the amount of $586,733,225.00, which damages are
> continuing. . . .

(Compl. ¶¶ 425-28.)

> Count XIV asserts a violation of Section 1 under the rule of reason:
>
> 431.  If the PWDs' concerted refusal to deal with secondary
> wholesalers is not per se unlawful, it is unlawful under the rule of
> reason, in that the anticompetitive effects of the PWD's collective
> conduct outweigh the pro-competitive effects.
>
> 432.  The concerted refusal to deal by the PWDs harms Plaintiff
> and other secondary wholesalers, which either cannot offer
> customers pharmaceutical products at all, or can do so only at a
> high cost that places them at a significant competitive
> disadvantage compared to the PWDs.
>
> 433.  As a result of this restriction of competition, consumers will
> pay higher to obtain pharmaceutical products that they would in a
> fully competitive market.

434.  As a direct and proximate result of the PWDs' improper group boycott, Plaintiff has been injured in its business and property in the amount of $586,733,225.00, which damages are continuing. . . .

(*Id.* ¶¶ 431-34.)

### 2.      *Elements of a Section 1 Claim*

As noted *supra*, to state a Section 1 claim, a plaintiff must establish: "[1] a combination or some form of concerted action between at least two legally distinct economic entities that [2] constituted an unreasonable restraint of trade either per se or under the rule of reason."  *PepsiCo*, 315 F.2d at 109 (citations and internal quotation marks omitted).  For the reasons that follow, the Court finds that Plaintiff's Section 1 claims against the PWDs fail because the Complaint does not allege facts which plausibly suggest an agreement.[14]

### 3.      *The Complaint Fails to Allege the Existence of an Actionable Conspiracy by the PWDs*

Similar to Plaintiff's Section 1 claims against the Manufacturing Defendants, discussed *supra*, Plaintiff's Section 1 claims against the PWDs allege solely that the PWDs "agreed with each other" not to deal with Plaintiff.  Thus, as with Plaintiff's Section 1 claims against the Manufacturing Defendants, Plaintiff's Section 1 claims against the PWDs must fail; Plaintiff's "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality [under Section 1]."  *Twombly*, 550 U.S. at 557; *see also Iqbal*, 129 S. Ct. at 1950 (explaining that in *Twombly,* "[P]laintiff['s] assertion of an unlawful agreement was a '"legal conclusion"' and, as such, was not entitled to the assumption of truth.").

---

[14]  Because the Court finds that Plaintiff failed to allege the first element of a Section 1 claim, the Court need not, and does not, address the second element, viz. whether Plaintiff has alleged an unreasonable restraint of trade.

Moreover, to the extent Plaintiff relies on allegations of parallel conduct to support its Section 1 claims, Plaintiff's reliance is unpersuasive.  In this regard, Plaintiff is incorrect that allegations of parallel conduct are in and of themselves sufficient to withstand dismissal.  (*See* Pl's Mem. of Law in Opp'n to Wholesaler Defs.' Rule 12(b) Motion to Dismiss at 24.)  Rather, as discussed above, an allegation of parallel conduct and a bare assertion of conspiracy will not suffice [to state a Section 1 claim]."  *Twombly*, 550 U.S. at 556-57.

Plaintiff also contends, however, that along with parallel conduct, it has sufficiently alleged "'a common motive to conspire' []to eliminate the secondary wholesale market."  (*See* Pl's Mem. of Law in Opp'n to Wholesaler Defs.' Rule 12(b) Motion to Dismiss at 24.)  Plaintiff's contention has no merit.

As an initial matter, it is questionable whether Plaintiff's allegations even establish a pattern of parallel conduct.  The PWDs argue that "the wide disparity in how the wholesaler defendants allegedly treated [Plaintiff] on its face demonstrates non-parallel conduct."  (Mem. of Law in Supp. of the Wholesaler Defs.' Mots. to Dismiss at 18.)  For example, the PWDs point out that Plaintiff's alleged sales relationships with the PWDs run the gamut from "periodic[]" (Compl. ¶ 198), to "intermittent[]" (*id.* ¶ 232), to sales over periods ranging from several months to several years, to a multi-year supply contract.  In addition, "[t]he dates that [Plaintiff] alleges it last purchased from the various wholesaler defendants range from 2000 through mid-2006."  (*Id.* at 19.)

Plaintiff counters that parallel conduct is alleged in that each of the PWDs announced in 2006 that it was refusing to provide product to Plaintiff and other secondary wholesalers.  On reply, the PWDs assert that given that the dates that PWDs stopped selling to

Plaintiff ranged from 2000 to 2006, the "allegation that the [PWDs] denied or ignored requests sent by [Plaintiff] over a six-month period [in 2006] does not render the conduct here 'parallel' merely because the [PWDs] provided responses confirming the independent, non-parallel decisions they previously had made."  (Reply Mem. in Further Support of the Wholesale Defs.' Mots. to Dismiss at 9-10.)

Even assuming arguendo that the conduct alleged in the Complaint could be construed as parallel, Plaintiff's Section 1 claims still fail as there are no facts alleged to support the inference that those actions were more plausibly concerted conduct than "lawful parallel conduct." *Twombly*, 550 U.S. at 556.  Although Plaintiff conclusorily states in its brief that "there was no legitimate reason for refusing to [sell to Plaintiff] other than to quell competition" (Pl's Mem. of Law in Opp'n to Wholesaler Defs.' Rule 12(b) Motion to Dismiss at 24), there are no facts alleged in the Complaint to support this conclusion.  Thus, because the parallel conduct alleged in the Complaint, if any, "could just as well be [the product of] independent action" *Twombly*, 550 U.S. at 557, Plaintiff's Section 1 claims fail.  *See Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("When a complaint 'relies either on wholly conclusory statements of concerted action, or, at best, on mere parallel conduct,' and when plaintiffs 'sprinkle[ ] the words "conspired," "concerted," and "concertedly" throughout' the complaint, that complaint is insufficient to state a § 1 claim.") (quoting *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 577 (S.D.N.Y. 2007)).[15]

---

[15]  To the extent Plaintiff attempts to assert an unpleaded theory of conspiracy between the Manufacturing Defendants and the PWDs, that claim has already been rejected by the Court. *See supra* at pages ----.

C.   *Plaintiff's Claims Under the Donnelly Act Are Dismissed*

Plaintiff's Donnelly Act claims rest entirely on the federal antitrust allegations and are therefore subject to dismissal for the reasons discussed above.  *See, e.g.*, *Empire Volkswagon*, 814 F.2d at 98 (dismissal of Sherman Act claim required dismissal of Donnelly Act claim).

IV.   *Plaintiff's Claim Against HDMA is Dismissed*

A.   *The Complaint*

The Complaint alleges that HDMA "is a voluntary association of wholesalers of pharmaceutical products which now excludes secondary wholesalers from its ranks."  (Compl. ¶ 245.)  Plaintiff became an "affiliate member of HDMA in or about 2005."  (*Id.* ¶ 247.)  On July 29, 2005, Plaintiff advised HDMA that it was "'having major problems in opening up accounts with most major pharmaceutical manufacturers whose common thread of rejection . . . borders on an absolute, definable, and provable conspiracy to restrain trade and compromise our industry.'"  (*Id.* ¶ 248.)  Plaintiff then requested that HDMA "look into this issue."  (*Id.*)  The following week, HDMA's Director of State Government Affairs advised Plaintiff that he would share Plaintiff's concern over this "potentially troubling situation . . .with the appropriate people at HDMA" and get back to Plaintiff.  (*Id.* ¶ 249.)  In December 2005, Plaintiff was notified by HDMA that Plaintiff was "'no longer eligible for HDMA membership.'"  (*Id.* ¶ 250.)

Plaintiff asserts one federal cause of action against HDMA.  Count XIX alleges that HDMA violated Section 2 of the Sherman Act by unilaterally refusing to provide Plaintiff with membership in HDMA, which membership is claimed to be an "essential facility" for competing in the prescription drug distribution business.  More specifically, Plaintiff alleges

that:

> [ ]  The exclusion of Plaintiff from HDMA membership was, upon information and belief, directed by, or acquiesced in by, the PWDs [who are all members of HDMA], whose intention was to exclude Plaintiff from participation in an essential industry organization and permit some to of the Manufacturing Defendants to use the exclusion of Plaintiff from the HDMA as a purported "basis" for refusal to deal with Plaintiff.

> . . . .

> [ ]  The purpose of Defendant HDMA's refusal to provide an essential facility to Plaintiff and others was so as to consolidate the monopoly power of the HDMA members (to wit, the PWDs), eliminate the 'secondary wholesaler' class of trade, eliminate competition for the PWDs' products in the relevant market, and thereby keep wholesale prices for the PWDs products artificially high.

> [ ] As such, Defendant HDMA engaged in an individual refusal to provide Plaintiff and others with an essential facility in order to maintain the monopoly power of the PWDs, and participated in a concerted refusal to sell to, and a group boycott of, Plaintiff and others.

(*Id.* ¶¶ 251, 476-77.)

> **B.**     ***Plaintiff's Claims Under Section 2 of the Sherman Act Against HDMA are Dismissed***

As stated above, to state a claim for monopolization under Section 2, a plaintiff must allege that a defendant: (1) possesses monopoly power in a relevant market; and (2) acquired or maintains that monopoly power by anticompetitive means.  *Trinko*, 540 U.S. at 407. As with the Manufacturing Defendants, Plaintiff's claims for monopolization against HDMA are fundamentally flawed because the Complaint fails to allege that HDMA competes in the relevant markets.  *See Discon*, 93 F.3d at 1062 ("[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete.").  The Complaint identifies four markets, viz. the wholesale

market, the group purchasing market, the dispensing facility market, and governmental agencies and related facilities.  (Compl. ¶ 273.)  There is no allegation that HDMA distributes pharmaceuticals, sells pharmaceuticals, or otherwise participates in any way whatsoever in any of the alleged markets.  Moreover, Plaintiff alleges no facts from which the Court could infer that HDMA possesses monopoly power in any of the identified markets.  In fact, Plaintiff makes no allegations concerning HDMA's purported share in *any* market, much less the ones pled.

Instead, in its opposition brief, Plaintiff argues that as an association, HDMA is made up of its members, viz. the PWDs, which collectively control in excess of 95% of the wholesale pharmaceutical market in the United States.  Even assuming that Plaintiff is correct that HDMA stands in the shoes of its members for purposes of determining Section 2 liability, which proposition is dubious at best, as discussed *supra*, the Second Circuit has specifically rejected monopolization claims under Section 2 based on a shared monopoly theory of liability. *See H.L. Hayden Co.*, 879 F.2d at 1018; *see also Flash Elecs.*, 312 F. Supp. 2d at 397.

Apparently conceding the inadequacy of its pleaded Section 2 unilateral monopolization claim, Plaintiff now argues that HDMA is liable for a conspiracy to monopolize under Section 2, based upon a conspiracy between HDMA's members, which collectively possess monopoly power.  (*See* Pl.'s Mem. of Law in Opp'n to HDMA's Rule 12(b)(6) Mot. to Dismiss at 9-10 (asserting that the case law does not reject a shared monopoly theory in the context of a claim of conspiracy to monopolize).)  Even assuming such a shared monopoly claim was viable,[16] and assuming further that HDMA, as a separate entity, could be subject to liability based upon the actions of its members, Plaintiff's claim would still fail as the Court has already

---

[16] *See supra* at pages – discussing viability of a shared monopoly theory.

held that the Complaint fails to allege a conspiracy – under both Sections 1 and 2 – against the

PWDs.  Accordingly, Plaintiff's Section 2 claims against HDMA are dismissed.

###    C.    *Plaintiff's Claims Under the Donnelly Act Are Dismissed*

As with the other defendants, Plaintiff's Donnelly Act claims, which are based

entirely on the federal antitrust allegations, are dismissed.  *See, e.g.*, *Empire Volkswagon*, 814

F.2d at 98 (dismissal of Sherman Act claim required dismissal of Donnelly Act claim).

### V.    *Plaintiff's Claims Against Ferreira and Pasquale are Dismissed*; *Plaintiff's Remaining Claims Against McKesson are Dismissed*

The fourth and final motion is brought by the McKesson Defendants, viz.

McKesson, Ferreira, and Pasquale, who move to dismiss the causes of action unique to them: (1)

Count IV alleging attempted monopolization by McKesson in violation of Section 2 of the

Sherman Act; (2) Count XXI, alleging that all three defendants violated SOX; (3) Counts XXII

and XXIII alleging that defendants Ferreira and Pasquale violated RICO; and (4) Count XX

alleging that all defendants violated the Donnelly Act.  For the reasons explained below, the

Court grants the McKesson Defendants' motion in its entirety.

###    A.    *Plaintiff's Attempted Monopolization Claim Against McKesson is Dismissed*

Count IV asserts that McKesson – and only McKesson – has attempted to

monopolize the wholesale pharmaceutical market in violation of Section 2.  More specifically,

Plaintiff alleges that:

> [ ] Defendant McKesson has engaged in the course of conduct
> above alleged with the specific intent of acquiring a monopoly of
> the wholesale pharmaceutical product market in the geographic
> area where Plaintiff operates its business in violation of §2 of the
> Sherman Act (15 U.S.C. §2).
>
> [ ] There is a dangerous probability that Defendant McKesson's

37

> course of conduct above alleged will result in a monopoly of the
> wholesale pharmaceutical product market in the geographic area
> where Plaintiff operates its business.

(Compl. ¶¶ 314-15.)

"To state an attempted monopolization claim, a plaintiff must establish '(1) that

the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

monopolize and (3) a dangerous probability of achieving monopoly power.'" *PepsiCo.*, 315 F.3d

at 105 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  Here, Plaintiff's

claim fails because Plaintiff has not alleged that McKesson alone has "a dangerous probability of

achieving monopoly power" in the wholesale pharmaceutical market.

"A threshold showing for a successful attempted monopolization claim is

sufficient market share by the defendant" because a defendant's market share "is the primary

indicator of the existence of a dangerous probability of success."  *Twin Labs.*, 900 F.2d at 570.

Here, Plaintiff does not dispute that it has not alleged McKesson's market share nor that

McKesson alone possesses monopoly power or has a dangerous probability of achieving it.

Instead, it relies on paragraph 289 of its Complaint and an alleged 95% market share of all 5

PWDs combined to show that McKesson possesses monopoly power.  Paragraph 289 alleges as

follows:

> 289.  There is a dangerous probability that if Defendant
> McKesson, individually and in concert with Defendants Cardinal,
> AmerisourceBergen, H.D. Smith and Bellco, is allowed to
> continue in its efforts to eliminate of control the secondary
> wholesaler class of trade, Defendant McKesson will further
> increase and entrench its existing monopolistic market power in
> the whole pharmaceutical product market.

(Compl. ¶ 289.)  Plaintiff also alleges that market share need not be pled where there is evidence

of actual exclusion of competition from the market.  *See Twin Labs.*, 900 F.2d at 570 (noting that

although market share is the "primary indicator" of a dangerous probability of success, it is "not

the sole one").

Regardless of how Plaintiff attempts to satisfy its pleading obligation with regard

to alleging that McKesson has "a dangerous probability of achieving monopoly power," it is

clear that Plaintiff's claim against McKesson depends entirely on the assumption of joint

conduct by all five of the PWDs, as opposed to unilateral conduct by McKesson.  However,

Plaintiff has cited no authority which would support such a claim, which in essence is a

"conspiracy to attempt to monopolize," under Section 2.  Moreover, even if there was such a

cause of action, Plaintiff does not and cannot allege that the object of any such conspiracy was to

create McKesson as the lone monopolist.  In that regard, it would be implausible to suggest that

the other PWDs would conspire to create a monopoly for McKesson only, thereby driving

themselves out of business.  Accordingly, Count IV is dismissed.

**B.**      ***Plaintiff's SOX Claim Against the McKesson Defendants is Dismissed***

Count XXI asserts that the McKesson Defendants violated SOX.  In its opposition

brief, Plaintiff withdraws this claim as against all three defendants.  (*See* Pl.'s Mem. of Law in

Opp'n to McKesson Defs.' Rule 12(b)(6) Mot. to Dismiss at 10-11.)  Accordingly, Count XXI is

dismissed.

**C.**      ***Plaintiff's RICO Claims Against Ferreira and Pasquale are Dismissed***

Counts XXII and XXIII allege that defendants Ferreira and Pasquale, officers of

McKesson, committed wire fraud and violated RICO by allegedly misrepresenting to the

Manufacturing Defendants the quantity of goods ordered by Plaintiff.  Count XXII asserts a

39

violation of 18 U.S.C. § 1962(c), to wit, a substantive RICO violation.  Count XXIII asserts a

violation of § 1962(d), RICO conspiracy.  The Court begins its analysis with an examination of

the RICO allegations.

1.   *The Complaint*

The Complaint alleges, in pertinent part, as follows:

[ ] Heretofore, and on or about October 1, 2003, the Plaintiff (and
certain affiliated companies) entered into an agreement with
McKesson (the "Supply Agreement") wherein and whereby
McKesson agreed to a multi-year program for the supply of
prescription pharmaceutical products by McKesson to Plaintiff.

[ ] Pursuant to the terms of the Supply Agreement, Plaintiff was
required to, and did, designate McKesson as a primary supplier
and to purchase from McKesson substantially all of the
pharmaceutical products that Plaintiff would purchase for resale.

[ ] Throughout the balance of 2003, 2004, 2005, and part of 2006,
Plaintiff received a total of approximately $529 million of goods
from McKesson pursuant to the Supply Agreement, and
completely and timely complied with all of the terms thereof on its
part.

[ ] The quantity of product received by Plaintiff from McKesson,
however, was significantly less than the quantity actually ordered
by Plaintiff from McKesson.

[ ] Pursuant to its agreements with the Manufacturers, McKesson
was required to accurately report to the Manufactures the quantity
of product ordered by Plaintiff (and other McKesson customers),
and the quantity of the ordered product that was fulfilled by
McKesson on a daily or weekly basis, so that the Manufacturers
could ensure that an adequate supply of product was available to
satisfy the needs of Plaintiff (and McKesson's other customers).

[ ] Notwithstanding that reporting requirement, McKesson falsely
and fraudulently reported to the Manufacturers, thousands of times
throughout the period it dealt with Plaintiff, that Plaintiff was
receiving 100% of the product that it was ordering from
McKesson.  McKesson perpetrated this fraud by refusing to permit

40

Plaintiff to place its orders on-line through the usual McKesson SMO ordering system, which would have then been reported electronically.  Instead, McKesson set up an alternative ordering system for Plaintiff so that the Manufacturers would not know the size of daily orders being placed by Plaintiff.  This alternative system for Plaintiff was deliberately and willfully created to defraud the manufacturers, the Plaintiff, the SEC, McKesson's accountant and SEC attorneys, and its public shareholders. Notwithstanding its reporting requirements, McKesson used this alternate ordering system so that it could, and did, falsely and fraudulently report to the Manufacturers that Plaintiff was receiving 100% of the product that it was ordering from McKesson.

. . . .

[ ] On or about February 23, 2006, McKesson notified Plaintiff that it was terminating the Supply Agreement in its entirety on May 23, 2006.

. . . .

[ ] Defendant McKesson, through defendants Ferreira and Pasquale, and others, has repeatedly and consistently used the United States mails and wires to (i) transmit fraudulent representations to various Manufacturers intended to induce the Manufacturers to believe that all of Plaintiff's pharmaceutical purchasing requirements were being met, and (2) fraudulently advise McKesson's public shareholders, accountants, auditors and attorneys that all orders being placed by Plaintiff were, in fact, being fulfilled by McKesson.

[ ] The actions of Defendant Ferreira and Pasquale in repeatedly causing to be transmitted by mail and wire false reports to the Manufacturers, and McKesson's public shareholders, accountants, auditors and attorneys, took place on thousands of occasions between October 1, 2003 and May 23, 2006 and took a virtually identical form, to wit (i) Defendant McKesson would receive by wire an order from Plaintiff for the purchase of a quantity of goods, (ii) Defendants Ferreira and Pasquale would then cause a fraudulent report to be sent by wire to the Manufacturers of those goods, falsely representing that a significantly lower quantity of goods had been ordered by Plaintiff; and (iii) Defendants Ferreira and Pasquale would then fraudulently misreport those orders or fail

41

> to disclose that McKesson had failed to fulfill large orders from
> Plaintiff, in reports given by mail, wire and otherwise to
> McKesson's shareholders, accountant, auditors and attorneys.
>
> . . . .
>
> [ ] Such acts of Defendants Ferreira and Pasquale, as aforesaid,
> individually and in concert, have proximately caused injury to the
> Plaintiff in its business and property in the sum of
> $586,733,225.00.
>
> [ ] Additionally, Plaintiff is entitled to recover three-fold such
> damages ($1,760,199,675.00) . . . .

Compl. ¶¶ 181-89; 241-42, 500-01.)

In its opposition papers, Plaintiff asserts that "[w]hile the actions of the

McKesson Defendants *vis-a-vis* shareholders, accountants, auditors and attorneys may be

relevant for other reasons in the pending case, there is no contention on the part of [Plaintiff] that

those acts form any part of the basis for the RICO claim asserted here."  (*See* Pl.'s Mem. of Law

in Opp'n to McKesson Defs.' Rule 12(b)(6) Mot. to Dismiss at 20 n.13.)  Thus, as stated by

Plaintiff, Plaintiff's RICO causes of action against Ferreira and Pasquale are limited to its claim

that Ferreira and Pasquale "did not accurately transpose the information received on the manual

sheets from [Plaintiff] onto the electronic reports that McKesson then sent to the Manufacturers."

(*Id.* at 12-13.)

### 2.  *Applicable Law*

"RICO is a broadly worded statute that 'has as its purpose the elimination of the

infiltration of organized crime and racketeering into legitimate organizations operating in

interstate commerce.'" *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268

F.3d 103, 107 (2d Cir. 2001) (quoting S. Rep. No. 91-617, at 76 (1969)).  "Because the mere

assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Bell v. Hubbert*, No. 95 Civ. 10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007) (citations and internal quotation marks omitted).

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (citations and internal quotation marks omitted); *see also City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 439 (2d Cir. 2008). Thus, to state a claim under the civil RICO statute, "a plaintiff has two pleading burdens." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). First, the complaint must allege that the defendant has violated "the substantive RICO statute . . . commonly known as 'criminal RICO.'" *Id.* In order to meet this initial burden, a plaintiff must plead "the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *See id.* Allegations in support of predicate acts sounding in fraud, such as mail or wire fraud, must satisfy the rigors of Rule 9(b). *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993); *Zhu v. First Atl. Bank*, No. 05 Civ. 96, 2005 WL 2757536, at *3 (S.D.N.Y. Oct. 25, 2005). Second, a plaintiff must allege that the injury to business or property occurred by reason of a violation of the criminal RICO statute. *See Moss,* 719 F.2d at 17.

Ferreira and Pasquale argue that Plaintiff's RICO claims must be dismissed

43

because the Complaint fails to plead:  (1) the predicate acts of mail or wire fraud; (2) a pattern of racketeering activity; and (3) injury or proximate causation.  Because the Court finds that Plaintiff has failed to allege that any injury it suffered was proximately caused by the alleged racketeering activity, the Court dismisses Plaintiff's RICO claims and does not address the remaining arguments.

### 3.    Plaintiff has Failed to Allege that its Injuries Were Proximately Caused by the Predicate Acts

The Complaint does not explain how the purported RICO violations, viz. alleged fraudulent transmissions to unidentified "Manufacturers" indicating that Plaintiff's orders were being fulfilled, caused injury to Plaintiff; it just summarily alleges that they did.  However, the Complaint does allege that the purpose of the alleged racketeering scheme was to inflict competitive injury on Plaintiff (Compl. ¶ 244), and the damages sought (approximately $1.76 billion) mirror the amount of antitrust damages sought.  In addition, in its opposition papers, Plaintiff states that "[t]he predicate acts of fraud on the part of the enterprise . . . resulted in . . . McKesson's ability to continue to suppress [Plaintiff] as a legitimate competitor because the same persuaded Manufacturers that there was no need to increase [Plaintiff's] allotment of product, nor to establish a direct purchasing relationship with [Plaintiff]."  (Pl.'s Mem. of Law in Opp'n to McKesson Defs.' Rule 12(b)(6) Mot. to Dismiss at 19-20.)

Ferreira and Pasquale argue that even assuming an anticompetitive injury were alleged, under the Supreme Court case *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), Plaintiff has failed to plead proximate causation.  For the reasons set forth below, the Court agrees.

44

### a.    *Controlling Supreme Court Case Law on Causation*

The RICO statute provides that any person injured "by reason of a violation of section 1962" may maintain a civil RICO suit.  18 U.S.C. § 1964(c).  Analysis of causation under § 1962(c) is controlled by three key Supreme Court decisions.  First, in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), the Court explained that the damages from any injury caused under RICO must "flow from the commission of the predicate acts."  *Id.* at 497.  Thus, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation."  *Id.* at 496.

Next, in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992), the Court focused on § 1964(c)'s requirement that the injury be "by reason of" the RICO violation.  While recognizing that this language could be read broadly to permit recovery merely upon a showing that defendant's violation was the "but-for" cause of plaintiff's injury, the Court found that the statute was not intended to be read so broadly.  *Id.* at 265-66 (noting the "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" under RICO).  Instead, the Court held that a plaintiff must demonstrate that the violation was not only the "but-for" cause of the injury, but also the proximate cause, which "demand[s] for some direct relation between the injury asserted and injurious conduct alleged."[17]  *Id.* at 268; *see also id.* at 271 ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step.") (citation

---

[17]  The Second Circuit has explained that the term "proximate causation" when used in the RICO context "takes on a meaning that is different from its ordinary meaning at common law."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 (2d Cir. 2006).  "When a plaintiff brings suit under RICO . . . he or she must show both that he [or she] is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent."  *Id.* (citations and internal quotation marks omitted).

and internal quotation marks omitted).  The Court "noted the following three policy reasons for requiring proximate causation in the RICO context: (1) the factual difficulty of measuring indirect damages and distinguishing among distinct independent causal factors; (2) the complexity of apportioning damages among plaintiffs 'to obviate the risk of multiple recoveries'; and (3) the fact that 'the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law.'"  *Smokes-Spirits.com*, 541 F.3d at 440 (quoting *Holmes*, 503 U.S. at 269).  Applying these principles, the Court in *Holmes* held that the injury alleged was too remote to allow recovery because it was contingent upon the harm to another.  *Holmes*, 503 U.S. at 271-74.[18]

Lastly, in *Anza*, the plaintiff brought a RICO action against his competitor claiming injury to his business caused by the competitor's alleged practice of unlawfully selling products free of sales tax and submitting fraudulent sales tax returns by mail and wire fraud.  In finding that the plaintiff had inadequately alleged that the competitor's alleged defrauding of the state tax authority was the proximate cause of plaintiff's lost sales, the Supreme Court stated that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  547 U.S. at 461.  Because

---

[18]  The defendants in *Holmes* were alleged to have participated in a conspiracy to manipulate the value of the stock of several companies.  *See Holmes*, 503 U.S. at 262.  When the fraud was disclosed, two broker-dealers who dealt in large amounts of the manipulated stock were put into liquidation when the share prices plummeted and were thus unable to meet their financial obligations to their customers.  The Securities Investor Protection Corporation ("SIPC"), which was required to reimburse the injured broker-dealer firms' customers, alleged that the defendants' securities and wire-fraud offenses amounted to a pattern of racketeering activity within the meaning of RICO.  *Id.* at 262-63.

the "direct victim of [the competitor's] conduct was the State of New York [in that] it was the

State that was being defrauded and the State that lost tax revenue as a result," *id.* at 458, the

Court found Plaintiff's claimed RICO damages were too attenuated. *Id.* at 459. The Court

explained:

> The cause of [plaintiff's] asserted harms . . . is a set of actions
> (offering lower prices) entirely distinct from the alleged RICO
> violation (defrauding the State). . . . This conclusion is confirmed
> by considering the directness requirement's underlying premises.
> *See* [*Homles*,] 503 U.S., at 269-270, 112 S.Ct. 1311. One
> motivating principle is the difficulty that can arise when a court
> attempts to ascertain the damages caused by some remote action.
> *See id.*, at 269, 112 S.Ct. 1311 ("[T]he less direct an injury is, the
> more difficult it becomes to ascertain the amount of a plaintiff's
> damages attributable to the violation, as distinct from other,
> independent, factors"). . . .
>
> There is, in addition, a second discontinuity between the RICO
> violation and the asserted injury. [Plaintiff's] lost sales could have
> resulted from factors other than [defendants'] alleged acts of fraud.
> Businesses lose and gain customers for many reasons, and it would
> require a complex assessment to establish what portion of
> [plaintiff's] lost sales were the product of [the
> defendant/competitor's] decreased prices. . . .
>
> The attenuated connection between [plaintiff's] injury and the
> [defendants'] injurious conduct thus implicates fundamental
> concerns expressed in *Holmes*. Notwithstanding the lack of any
> appreciable risk of duplicative recoveries, which is another
> consideration relevant to the proximate-cause inquiry, *see id.*, at
> 269, 112 S.Ct. 1311, these concerns help to illustrate why
> [plaintiff's] alleged injury was not the direct result of a RICO
> violation. Further illustrating this point is the speculative nature of
> the proceedings that would follow if [plaintiff] were permitted to
> maintain its claim. A court considering the claim would need to
> begin by calculating the portion of [the defendant/competitor's]
> price drop attributable to the alleged pattern of racketeering
> activity. It next would have to calculate the portion of [plaintiff's]
> lost sales attributable to the relevant part of the price drop. The
> element of proximate causation recognized in *Holmes* is meant to
> prevent these types of intricate, uncertain inquiries from

overrunning RICO litigation.  It has particular resonance when
applied to claims brought by economic competitors, which, if left
unchecked, could blur the line between RICO and the antitrust
laws.

. . . .

The Court of Appeals reached a contrary conclusion, apparently
reasoning that because the [defendants] allegedly sought to gain a
competitive advantage over [plaintiff], it is immaterial whether
they took an indirect route to accomplish their goal. *See* 373 F.3d
at 263.  This rationale does not accord with *Holmes*.  A RICO
plaintiff cannot circumvent the proximate-cause requirement
simply by claiming that the defendant's aim was to increase
market share at a competitor's expense.  *See Associated Gen.*
*Contractors*, 459 U.S., at 537, 103 S.Ct. 897 ("We are also
satisfied that an allegation of improper motive . . . is not a panacea
that will enable any complaint to withstand a motion to dismiss").
When a court evaluates a RICO claim for proximate causation, the
central question it must ask is whether the alleged violation led
directly to the plaintiff's injuries.  In the instant case, the answer is
no.  We hold that [plaintiff's] § 1962(c) claim does not satisfy the
requirement of proximate causation.

*Id.* at 458-61.

> **b.**     ***Application to the Present Case***

        The Court finds unpersuasive Plaintiff's argument that it has suffered a more

direct injury than the plaintiff in *Anza*, or, for that matter, that is has pled proximate causation

under *Holmes* or *Sedima*.  As in *Anza*, all we have here is an "allegation of improper motive,"

i.e., that Ferreira and Pasquale misrepresented that Plaintiff's orders were being filled to "to

increase [McKesson's] market share at [Plaintiff's] expense."  *Id.* at 460.  Indeed, the correlation

between defendants' lower prices and plaintiff's lost profits would likely have been easier to

ascertain in *Anza* than in the instant case.  If Plaintiff's RICO claims were allowed to proceed,

the Court would first need to ascertain the extent to which Plaintiff's alleged inability to compete

was the result of the alleged fraudulent transmissions sent by Ferreira and Pasquale to unidentified "Manufacturers" or the result of other factors such as the changes in the regulatory environment regarding the pedigree rules (Compl. ¶¶ 261-65); the imposition by manufacturers of restrictions on selling to secondary wholesalers (*id.* ¶ 256); McKesson's termination of its Supply Agreement with Plaintiff (*id.* ¶ 189); and the alleged reluctance of all of the defendant companies to do business with Plaintiff. *Cf. Holmes*, 503 U.S. at 272-73 ("If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets.").

　　　　　Moreover, the other factors cited in *Anza* also require dismissal. First, here, as in *Anza*, it was a third party (the Manufacturing Defendants) that were defrauded and not the Plaintiff. *Anza*, 547 U.S. at 458 ("It was the State that was being defrauded and the State that lost revenue."). Next, the Manufacturing Defendants are fully capable of availing themselves of any legal rights they believe they may have. *Id.* at 460 ("The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims.").

　　　　　In sum, the Court finds that Plaintiff has failed to plead that its alleged RICO damages, viz. its alleged inability to compete in the wholesale pharmaceutical market, were proximately caused by the alleged predicate acts, to wit, the alleged false reports filed by Ferreira and Pasquale. Because Plaintiff has failed to allege that it has been injured "by reason of a violation of section 1962," 18 U.S.C. § 1964(c), Count XXII is dismissed.

### 4.      *Plaintiff's RICO Conspiracy Claim is Dismissed*

In addition to asserting substantive RICO claims under section 1962(c), Count

XXIII alleges a RICO conspiracy claim under section 1962(d).  This claim too must be

dismissed.  Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to

violate any of the provisions of subsection (a), (b), or (c) of this section."  Thus, to establish the

existence of a RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate

RICO's substantive provisions."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d

229, 244 (2d Cir. 1999) (citation and internal quotation marks omitted); *accord First Capital*,

385 F.3d at 182).  Because Plaintiff "did not adequately allege a substantive violation of RICO,"

its conspiracy claim is "properly dismissed."  *First Capital*, 385 F.3d at 182 (citations omitted);

*accord Nat'l Group for Commc'n and Computers Ltd. v. Lucent Techs. Inc.,* 420 F. Supp. 2d

253, 272 (S.D.N.Y. 2006) ("Case law in this Circuit confirms that a 1962(d) conspiracy claim

must be dismissed where the substantive RICO claim is deficient.").

### D.      *Plaintiff's Donnelly Claims are Dismissed*

Count XX alleges that all defendants violated the Donnelly Act.  In its opposition

brief, Plaintiff "agrees that there is no Donnelly Act claim asserted against either Ferreira and

Pasquale."  (*See* Pl.'s Mem. of Law in Opp'n to McKesson Defs.' Rule 12(b)(6) Mot. to Dismiss

at 20 n.13.)  In addition, the Court has found that Plaintiff's Donnelly claim fails to state a claim

against the PWDs, including McKesson, as well as all other remaining defendants.  Accordingly,

count XX is dismissed.

## VI.    *Leave to Amend is Denied*

Plaintiff does not move for leave to amend, either formally or informally, with

regard to any of its claims.  Although this Court would well be within its discretion to deny leave

to amend on that ground alone, *see Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1132 (2d

Cir. 1994)[19] ("Although federal courts are inclined to grant leave to amend following a dismissal

order, we do not deem it an abuse of the district court's discretion to order a case closed when

leave to amend has not been sought."), the Court notes that leave to amend is also not warranted

in this case because any amendment would be futile.  *See Foman v. Davis*, 371 U.S. 178, 182

(1962) (futility of amendment ground for denial of motion).  Here, Plaintiff has not provided the

Court with, or suggested the existence of, any new facts which could cure its pleading

deficiencies.  *Compare In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006)

("It is within the court's discretion to deny leave to amend implicitly by not addressing the

request when leave is requested informally in a brief filed in opposition to a motion to dismiss. . .

.  Furthermore, where amendment would be futile, denial of leave to amend is proper.") (citation

omitted); *Porat v. Lincoln Towers Cmty. Assoc.*, 464 F.3d 274, 276 (2d Cir. 2006) ("A counseled

plaintiff is not necessarily entitled to a remand for repleading whenever he has indicated a desire

to amend his complaint, notwithstanding the failure of plaintiff's counsel to make a showing that

the complaint's defects can be cured.").  Accordingly, although no applications have been made,

the Court declines to grant Plaintiff leave to amend.

---

[19]  The *Shields* decision was superseded by statute on other grounds, Private Securities
Litigation Reform Act, 15 U.S.C. § 78u-4, as recognized in *In Re Paracelsus Corp. Sec. Litig.*,
61 F. Supp. 2d 591, 595 (S.D. Tex. 1998).

*CONCLUSION*

For the foregoing reasons, Defendants' motions to dismiss the Complaint are

GRANTED in their entirety.  The Clerk of the Court shall close this case.

**SO ORDERED**

Dated: Central Islip, NY
        September 24, 2009

                              /s_____
                              Denis R. Hurley,
                              United States District Judge